UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KHAIRULDEEN MAKHZOOMI, | Case No. 18-cv-00924-DMR |
| Plaintiff, | |
| v. | **ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| SOUTHWEST AIRLINES CO., et al., | Re: Dkt. No. 81 |
| Defendants. | |

Plaintiff Khairuldeen Makhzoomi filed a complaint against Southwest Airlines Co. ("Southwest") and Shoaib Ahmed, a Southwest employee, alleging Defendants wrongfully removed him from a Southwest flight prior to takeoff in April 2016 for speaking on his phone in Arabic. He alleges claims for discrimination under 42 U.S.C. § 1981 and related tort claims under California law. Both Defendants now move for summary judgment. [Docket No. 81.] The court held a hearing on November 14, 2019. For the following reasons, the motion is granted in part and denied in part.

## I.    BACKGROUND

### A.    Factual Background

The following facts are undisputed, unless otherwise noted. Makhzoomi is an American citizen of Iraqi descent. He received asylum and moved to the United States from Iraq in 2010. He is Muslim and his native language is Iraqi Arabic. Makhzoomi Dep. 16, 17-18, 22, 87. On April 6, 2016, the date of the incident at issue in this lawsuit, Makhzoomi was a 26-year-old student enrolled at the University of California, Berkeley. *Id.* at 16, 18.

On that day, Makhzoomi boarded Southwest Flight 4260 from Los Angeles International Airport to Oakland. The night before the flight, Makhzoomi had attended a dinner at which the Secretary General of the United Nations was the keynote speaker. Makhzoomi was selected to ask

a question of the Secretary General; in his question, he asked about "the liberation of Mosul" in Iraq and twice mentioned the Islamic State. *Id*. at 88; https://www.youtube.com/watch?v=vyMt4gzsBrA (last visited Nov. 6, 2019).

Makhzoomi sat in the middle or window seat in the second or third row on the right side of the plane. Makhzoomi Dep. 84. Shortly after he sat down, he called his uncle in Iraq to tell him about the dinner the night before. They spoke in Iraqi Arabic. *Id*. at 10, 87. Makhzoomi was "happy and excited" about the event and told his uncle that he had asked the Secretary General about "the liberation of Mosul." They also discussed Makhzoomi's upcoming graduation and Makhzoomi told him, "[y]ou come to me and you visit me," to which his uncle responded, "inshallah," which means "God willing." *Id*. at 10, 88-89. According to Makhzoomi, he said inshallah "many times" during his call with his uncle. *Id*. at 104.

Dr. Anaisha Patel[1] was seated in the window seat directly in front of Makhzoomi. Patel Dep. 21, 23. Her first language is Hindi, and she also speaks several other languages, including Urdu. Patel does not speak or understand Arabic but testified that she believes that Urdu has words in common with Arabic. *Id*. at 10-12. While she was seated, Patel overheard Makhzoomi speaking in the row behind her. She heard the word "shahidi" which she testified was "concerning to [her]." *Id*. at 21-23. According to Patel, "shahidi" in Urdu and Hindi means "martyrdom"; "shahid" means "martyr." *Id*. at 25. Patel testified that after hearing "shahidi," she "sort of paid attention"; she explained that "[i]t's like if somebody said in English 'suicide' when I'm sitting and behind me, I would sort of have the same response." *Id*. at 22, 25. She then heard two more words, "American" and "inshallah." *Id*. at 22. She understood the word "inshallah" to mean "God willing" and testified "that's something I say to my friends, too." *Id*. at 22. When asked whether there was anything else about the conversation that was "concerning," apart from the word shahidi, Patel stated, "I would say the fact that 'American' was said next to it, and I'm on a plane, I wasn't sure what to make of it." *Id*. at 25.

Patel then turned around in her seat to look at Makhzoomi. She looked at him "for a length

---

[1] "Anaisha Patel" is a pseudonym used by both parties in this motion to protect her privacy.

of time" but did not say anything. *Id*. at 26. Patel did not recall whether Makhzoomi "return[ed] the look in any way," but testified that he did not acknowledge her. *Id*. at 29. According to Patel, after she looked at him, Makhzoomi turned his phone off. *Id*. at 26.

Makhzoomi testified that after speaking with his uncle about his question to the Secretary General, what he had eaten at the dinner, and his graduation, Patel "looked at me first, but she stared at me, so I didn't do anything. Then she looked at me again and she kept staring, and I thought that there was something wrong, so I looked at her. I want [sic] to see what's wrong, but after that, she left." Makhzoomi Dep. 90. According to Makhzoomi, he "stared at her probably two to three second[s] to see what was wrong" before she got up from her seat. *Id*. at 109. Makhzoomi ended the phone call at "the moment she left." *Id*. at 108-09. He denies that he used the word "shahid" during his conversation. *Id*. at 100.

Patel testified that after she heard the words shahidi, American, and inshallah, she "[did] not know what to think," but that she was trained as a physician "to report if I see a concern . . . [s]o as everybody tells you on the airport and in the news, report if you feel that something might be a question." Patel Dep. 39-40. She recognized that it was possible that Makhzoomi "intended harm to the airplane" and contacted a flight attendant. *Id*. at 29-30, 52. While seated, Patel informed the flight attendant that the person sitting behind her had used the word shahidi, "that [she] understand[s] this word, and . . . that it was [her] duty to share it with them." She told the flight attendant that the word "means martyr," and that she had also heard the words American and inshallah. *Id*. at 31-32. Patel testified that she felt "stressed out" because she recognized that "this was something that was fairly serious." *Id*. at 36.[2] However, she denied feeling frightened. She does not remember whether she was "visibly shaking" while she was speaking with any Southwest employees. *Id*. at 52.

Patel initially testified that she next spoke with a Southwest representative who told her he spoke Arabic and asked her what she'd heard. *Id*. at 33-34. After telling him that she heard the words shahidi, American, and inshallah, a different flight crewmember crew asked her to leave the

---

[2] Later in her deposition, Dr. Patel testified that she also felt "stressed out" about "[h]aving to communicate something about another passenger to the airline." *See* Patel Dep. 53.

plane to speak with someone else.  *Id*. at 34.  She deplaned and walked to the terminal where she

saw a security officer or policeman and repeated what she had overheard to that person.  *Id*. at 36-

37, 52.  Patel then returned to her seat.  *Id*. at 38-39.  Patel later testified that she also spoke with

one of the pilots at the front of the airplane, to whom she repeated the three words she had

overheard.  *Id*. at 50-51.  Patel testified that it was possible that her initial conversation with the

flight attendant took place at the front of the airplane, and that she had deplaned before speaking

with the Arabic-speaking Southwest employee.  *Id*. at 49-50.

The record contains transcripts from the depositions of various Southwest employees who

interacted with Patel and/or Makhzoomi, as well as brief written descriptions of the incident by the

same employees.  Only one of the reports appears to have been written on or near the date of the

incident, April 6, 2016.  *See* Tauaese Dep. Ex. 23 ("Irregularity Report" dated Apr. 6, 2016).

None of the remaining descriptions are contemporaneous.  *See* Ahmed Dep. Ex. 13 (Apr. 14, 2016

email); Boyer Dep. Ex. 25 (Dec. 1, 2016 email); Herrick Dep. Ex. 20 (Dec. 2, 2016 "Statement");

Hoyle Dep. Ex. 18 (Apr. 25, 2016 Incident Report).  Ahmed's own written description of the

incident is contained in an email dated April 14, 2016, which he wrote in response to a media

inquiry to Southwest following the incident.  *See* Ahmed Dep. 171; Apr. 14, 2016 email.  The

record also contains what appear to be incident reports written by three Southwest flight

attendants, in which each claimed to have spoken directly with Patel.  These reports were dated

April 16, 2016, April 17, 2016, and October 25, 2016.  Baghdadi Decl., Sept. 25, 2019, Exs. 15

(Ellis Incident Report, dated Apr. 17, 2016); 16 (Louder Incident Report dated Apr. 16, 2016); 17

(Sabo Incident Report, dated Oct. 25, 2016).  All of the witnesses were deposed in 2019, over two

and a half years after the incident.

According to First Officer Roderick Hoyle, one of the flight attendants came to the cockpit

and informed Captain Scott Herrick and Hoyle about a "passenger problem."  Hoyle Dep. 19-20,

22-23.  Hoyle testified that he left the cockpit and went to the forward galley, where he saw Patel.

He then walked her out into the jet bridge to speak with her.  *Id*. at 22-24.  Hoyle testified that

Patel was "shaking," "visibly upset," and "obviously agitated."  *Id*. at 24.  She explained to Hoyle

that she had overheard another passenger use in conversation a word from a different language

4

that "is only used when talking about suicide martyrdom." *Id*. at 25-26, 28.

Hoyle then returned to the cockpit to brief Herrick. *Id*. at 29-30. Herrick testified that Hoyle "told me about a male passenger that had said that he was going to martyr or be a martyr or something on our flight." Herrick Dep. 24. Herrick then asked Hoyle to bring Patel to the cockpit. Once in the cockpit, Patel told Herrick and Hoyle that she overheard a passenger say "he was going to martyr himself or be a martyr on this flight," and that "in his dialect . . . his words could only mean that." *Id*. at 27-28. According to Herrick, Patel was "[v]isibly upset, somewhat shaken, and apologetic." *Id*. at 35. Patel then left the cockpit. The pilots both testified that they agreed that she was sincere and credible. *Id*. at 37; Hoyle Dep. 29.

Herrick and Hoyle testified that they were concerned about the safety of the airplane and its passengers. Herrick Dep. 32, 75; Hoyle Dep. 136. After speaking with Patel, Herrick directed Hoyle to call for a customer service supervisor. Herrick Dep. 39. Hoyle left the cockpit and spoke with Juron Cherry, the operations agent working the flight. Hoyle Dep. 33; Boyer Dep. 75; Tauaese Dep. 17-18. Cherry requested a customer service supervisor and Elaine Tauaese responded to the call. Tauaese Dep. 18-20. Tauaese learned from Cherry that there was "a passenger issue" and then went to speak with Patel. *Id*. at 20-21. According to Tauaese, Patel told her that "she overheard passenger Makhzoomi having a cell phone conversation that included words of something to do with being a martyr for his cause." *Id*. at 23. Tauaese described Patel as visibly "nervous and scared." *Id*. at 23, 110. Tauaese testified that she had the impression that Patel was concerned about the safety of the flight, and Tauaese herself "felt a little nervous and uncomfortable . . . for the safety of the aircraft and the people on the aircraft." Tauaese Dep. 111. Tauaese then spoke with at least one of the members of the flight crew and learned they "felt a little bit uneasy" about having Makhzoomi on the aircraft. *Id*. at 33-34.

Tauaese then called on her radio for a manager. Two customer service managers, Defendant Ahmed and Jeffrey Boyer, came to the gate. Tauaese Dep. 28; Boyer Dep. 15-16. Ahmed, who grew up in Libya and Pakistan, speaks Arabic and is an observant Muslim. Ahmed Dep. 16, 31, 35. Ahmed and Boyer spoke with Patel shortly after they arrived at the gate. Ahmed Dep. 85-86; Boyer Dep. 20, 23. The record is not clear whether Ahmed spoke with Tauaese

5

before speaking with Patel. According to Tauease, she had a brief conversation with Ahmed alone when he arrived at the gate "to let him know what was going on before he could talk to Dr. [Patel]." Tauaese Dep. 30-32. However, Boyer testified that when he and Ahmed arrived at the gate, Tauaese was speaking with Patel, and that he and Ahmed "ask[ed] Dr. Patel . . . what was going on" without speaking with Tauaese first. Boyer Dep. 20, 23. Ahmed testified that when he arrived at the gate, a Southwest employee directed him to Patel, who was standing in the boarding area near where boarding passes are scanned. Ahmed Dep. 85-86. He did not remember Tauaese being present. *Id*. at 79-80. According to Ahmed, Patel was "hysterical, very frightened," and was crying. Ahmed Dep. 83, 85, 86. Boyer described Patel as "visibly shaking and upset and near tears." Boyer Dep. 20.

Patel testified that she told Ahmed that she heard a passenger speak the words shahidi, American, and inshallah. Patel Dep. 34. Her recollection differs from Ahmed's; he testified that after introducing himself to her, Patel told him that she overheard a passenger behind her speaking Arabic and using the words "bomb," "ISIS," "jihad," and "martyrdom." Ahmed Dep. 82-85, 88.

According to Herrick, after speaking with Patel, Ahmed went to the cockpit to speak with Herrick, who told Ahmed that Patel reported that she overheard a passenger saying "he was either going to be a martyr or martyr himself on this flight." Herrick Dep. 42, 45-46. Ahmed told Herrick that he was going to speak with the passenger and left the cockpit. *Id*. at 49. Ahmed testified that "[b]ased on what the customer had told me at that time, we had—we were duty bound to investigate, and we were proceeding as to figure that information out and process that information." Ahmed Dep. 65. According to Ahmed, "the investigation we performed was talking to Mr. Makhzoomi." *Id*. Ahmed asked one of the flight attendants to point out the passenger and went to where Makhzoomi was sitting. Ahmed Dep. 97. According to Makhzoomi, Ahmed told him, "I need you to step outside the aircraft right now." Makhzoomi Dep. 112. Makhzoomi immediately got up from his seat and went with Ahmed to the jet bridge. *Id*.

The parties appear to agree that once Ahmed and Makhzoomi reached the jet bridge, Ahmed attempted to say something in Arabic to Makhzoomi. Makhzoomi did not understand him

and asked him to speak in English. Makhzoomi Dep. 116-17. What happened next is disputed. Ahmed states that he informed Makhzoomi in English "as to what—why he was brought onto that bridge, and then 'Somebody has said that you were talking about this—this—these issues, ISIS, bomb'—," martyrdom, and jihad. Ahmed Dep. 101-02, 103, 116. Ahmed testified that Makhzoomi told him that "he was coming off a conference, and he was talking to his uncle," and that Makhzoomi admitted that he had used the words bomb, martyrdom, ISIS, and jihad, then apologized. *Id*. at 105, 116.

Makhzoomi disputes Ahmed's version of events. According to Makhzoomi, Ahmed asked him some questions in English about his phone call, including to whom Makhzoomi was speaking, the language in which he had been speaking, and the subject of his conversation. *Id*. at 117. Makhzoomi explained that he had been speaking with his uncle in Arabic about the event the night before. According to Makhzoomi, Ahmed responded, "Why do you speak in that language? Don't you know the environment around us? Don't you know the environment around us?" *Id*. at 117-18. Makhzoomi then apologized, saying "I'm sorry. I did not mean to speak in that language." *Id*. at 118. Ahmed then said to Makhzoomi, "Look what you have done. The plane got delayed because of you," to which Makhzoomi responded, "No, this—this is not me. This is what Islamophobia got this country into." *Id*. at 118, 130. Ahmed then stated, "You know what? You are not getting back into that plane." *Id*. at 118, 131. According to Makhzoomi, Ahmed did not tell him that Patel had reported that Makhzoomi had used certain words and did not ask him if he had used any of the words. *Id*. at 131, 136. Makhzoomi denies that he used the words ISIS, bomb, jihad, or shahid in his conversation with his uncle. *Id*. at 100, 132.

At some point in time that is not identified in the record, law enforcement responded to a call regarding a possible breach of security at the gate for Flight 4260. Taylor Dep. 18. It is not clear who contacted law enforcement. Ahmed, Boyer, and Tauaese each denied having done so. Ahmed Dep. 66, 90, 93; Boyer Dep. 39; Tauaese Dep. 41. Both Makhzoomi and Ahmed testified that by the time they reached the jet bridge, law enforcement officers were already on the scene. Makhzoomi Dep. 115; Ahmed Dep. 66. Los Angeles World Airports ("LAWA") Officer Richard Taylor, who testified that he was the first member of law enforcement to arrive, stated that when

1   he got to the jet bridge he saw Ahmed standing with Makhzoomi while other passengers were

2   boarding the flight. Taylor Dep. 19-21.

3       Ahmed testified that he did not need to report his conversation with Makzhoomi to the

4   LAWA officers because they were standing right behind Ahmed and Makhzoomi and heard

5   Makhzoomi admit to using the words bomb, martyrdom, ISIS, and jihad on the airplane. Ahmed

6   Dep. 67, 116, 122. Ahmed testified that at that point, law enforcement "essentially took over." *Id*.

7   at 122. According to Ahmed, the LAWA officers then asked Makhzoomi to step off the jet

8   bridge. Ahmed Dep. 109.

9       Makhzoomi disputes that LAWA officers acted upon admissions that they heard him make

10   during his interview with Ahmed. As previously noted, Makhzoomi denies using the words that

11   Ahmed claims he admitted to using. According to Makhzoomi, Ahmed spoke with a police

12   officer and the police officer called the FBI. Makhzoomi Dep. 118, 153-54. Taylor's testimony

13   and written report are consistent with this portion of Makhzoomi's account and contradict

14   Ahmed's testimony to some extent. As noted, Ahmed denied speaking with the officers before

15   they escorted Makhzoomi off the jet bridge and back to the gate, because the officers "took over"

16   after directly hearing Makhzoomi's admission. However, Taylor testified that Ahmed told him

17   that a passenger had overheard Makhzoomi "making statements on his cell phone that sounded

18   like 'martyr' or suicide statements," and that the passenger interpreted this as a "terrorist

19   statement." Taylor Dep. 22, 57-58, 70-71, Ex. 26 (Taylor report). Taylor then called for his

20   supervisor and additional officers, and two officers responded. Taylor Dep. 24. The officers

21   subsequently contacted the FBI and requested a K-9 unit, *id*. at 26, 30, and directed Makhzoomi to

22   accompany them to the gate area. Makhzoomi Dep. 150-53.

23       The record contains the testimony of one other witness to Makhzoomi and Ahmed's

24   interaction on the jet bridge. Hoyle testified that he came to stand on the jet bridge at some point

25   during their conversation. Hoyle Dep. 43, 57-58. He did not hear the entire conversation between

26   the two, but testified that he heard Ahmed say, "[t]his is an inappropriate conversation to have on

27   an airplane." *Id*. at 58, 61-62.

28       The LAWA officers held Makhzoomi in the terminal for approximately 45 minutes while

they waited for the FBI to arrive.  Makhzoomi Dep. 158-59.  While they were in the terminal, the officers ran a wants and warrants check on Makhzoomi.  They had a dog sniff Makhzoomi's carry-on bag and searched the bag.  Taylor Dep. 31-33; Makhzoomi Dep. 155.  One of the officers conducted a pat-down search of Makhzoomi and asked if he had a knife.  *Id*. at 34-35; Makhzoomi Dep. 155.

Two FBI agents and a detective with a special unit related to terrorist activity at the airport arrived at the gate.  Taylor Dep. 27-28.  Taylor "reported what had happened" to them and they took Makhzoomi to a private room in the airport for questioning.  Taylor Dep. 39; Makhzoomi Dep. 169.  Makhzoomi testified that "it was very nice at the beginning," and then FBI Agent Rachel Marriott told him that she was going to "speak to the manager."  When she returned, she said, "Khairuldeen, you have to be honest with us and tell us everything you know about martyrdom."  *Id*. at 170.  Makhzoomi explained that he had spoken with his uncle and gave her his phone.  Marriott left again, and when she returned, she said, "You know what?  You won't be able to fly with South – Southwest again today, and I advise you to apologize for Mr. Shoaib, and next time, buckle your seat belt and do not use your phone."  *Id*. at 170-71.  The agents ultimately released Makhzoomi, saying, "Sorry.  There has been misunderstanding, and we have to do our job."  *Id*. at 175-76.

In their report of the incident dated May 26, 2016, the FBI agents wrote that Makhzoomi reported that he had been questioned about his telephone conversation with his uncle, and "asked if he had spoken about ISIL, martyrdom, or suicide in America."  Stern Decl., Aug. 29, 2019, Ex. I (FBI report).  According to the report, "Makhzoomi told [redacted] he does not believe in jihad, martyrdom, or suicide," and "explained that while speaking to his uncle he may have said something about the Islamic State."  *Id*.

Makhzoomi's flight departed for Oakland without him while he was being questioned.  It is not clear who made the decision to depart without Makhzoomi.  According to Ahmed, it was a "team decision" to deny Makhzoomi the right to reboard the plane, made by Ahmed, the flight attendants, the captain, and the first officer.  Ahmed Dep. 15.  Hoyle testified that "the decision to not allow him to continue on the plane was a collaborative process between [Hoyle], the captain,

[and] the customer service supervisor." Hoyle Dep. 67. Other witnesses testified that Ahmed made the decision himself. Herrick testified that Ahmed "came in to say that the passenger was not going to be joining us on the flight," to which Herrick replied, "Okay." Herrick Dep. 61, 66. Similarly, Tauaese testified that Ahmed "decided that the passenger would have to come off" the airplane. Tauaese Dep. 120.

During the time the FBI was questioning Makhzoomi, Ahmed stood at the customer service podium and waited for him "to emerge from behind the doors." Ahmed Dep. 149. After some period of time, two FBI agents approached Ahmed and told him, "He's clear." *Id*. at 150. Makhzoomi then requested and received a refund of his ticket from Ahmed. Ahmed Dep. 151; Makhzoomi Dep. 177-78. They had no further interaction. *See id*. Thereafter, Makhzoomi walked through the airport and "kept asking every airlines [sic] if they ha[d] a ticket." Makhzoomi Dep. 178-79. When he reached the Terminal 3, he "had an emotional breakdown" and started crying. *Id*. at 179. He eventually booked a flight home on Delta Airlines. *Id*. at 179-80.

### B. Procedural History

Makhzoomi filed this lawsuit on February 13, 2018, alleging the following claims against Defendants: 1) 42 U.S.C. § 1981 claim for discrimination; 2) violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; 3) violation of California's Unruh Civil Rights Act, California Civil Code section 51; 4) negligence; and 5) intentional infliction of emotional distress. On August 14, 2018, the court dismissed Makhzoomi's Title VI claim against Ahmed. *Makhzoomi v. Southwest Airlines Co*., No. 18-cv-00924-DMR, 2018 WL 3861771, at *5 (N.D. Cal. Aug. 14, 2018). At the November 14, 2019 hearing, Makhzoomi voluntarily dismissed his remaining Title VI claim against Southwest.

## II. LEGAL STANDARDS

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the

light most favorable to the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249, 255

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott*, 550 U.S. at 380.

## III. DISCUSSION

Defendants move for summary judgment on Makhzoomi's section 1981 claim, arguing that there is at most a scintilla of evidence that their actions were motivated by racial animus. They also argue that federal law preempts Makhzoomi's state law claims and that they are entitled to immunity, and that in the alternative, they are entitled to summary judgment on those claims.[3]

### A. Section 1981 Claim

In his opposition to the motion, Makhzoomi asserted that "this case turns on a factual dispute concerning why [he] was deplaned and denied boarding," and that he "was removed for

_____

[3] The court notes that throughout their motion, Defendants make no distinction between Southwest and Ahmed individually for purposes of liability on any of Makhzoomi's remaining claims for relief. *See, e.g.*, Defs.' Mot. 12 ("Southwest asked Mr. Makhzoomi to step off the airplane . . ."); 16 ("The airline and its employees are immune from liability . . ."); 30 ("Judgment should be entered in favor of the Defendants . . ."). Accordingly, the court draws no such distinction for purposes of this opinion.

11

speaking in Arabic while other passengers who were not speaking in Arabic, were not deplaned, denied boarding, berated, and turned over to law enforcement." Opp'n 18, 19. At the hearing, counsel clarified Makzhoomi's basis for his 42 U.S.C. § 1981 claim. Makzhoomi denies that he used the word "shahidi" in his phone call with his uncle. However, he does not dispute that Patel *believed* that she heard him say "shahidi," "American," and "in'shallah" on the phone, nor does he challenge that she made a credible complaint to Southwest representatives based on what she believed she heard Makzhoomi say. Makzhoomi also does not challenge Defendants' decision to investigate Patel's complaint, including asking Makzhoomi to deplane for questioning. Makzhoomi's section 1981 claim is that Defendants discriminated against him based on his status as an Iraqi refugee and a member of the Middle Eastern and Muslim communities when Ahmed interviewed him as a result of Patel's complaint, and refused to allow him to re-board the flight after chastising him for speaking Arabic on the plane. Makhzoomi denies that he used the words shahid, ISIS, bomb, or jihad, and instead asserts that Ahmed's decision to deny him his seat on the flight after their conversation on the jet bridge was discriminatory and amounted to punishment for the fact that Makhzoomi had spoken in Arabic on the plane.

42 U.S.C. § 1981 "protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474-75 (2006) (quoting 42 U.S.C. § 1981(a)). The statute defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Section 1981 reaches both public and "purely private" acts of "purposeful" racial discrimination. *Nat'l Ass'n of African Am.-Owned Media v. Charter Commc'ns, Inc.*, 915 F.3d 617, 622 (9th Cir. 2019) (quoting *Runyon v. McCrary*, 427 U.S. 160, 170 (1976), *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982)). It also reaches intentional discrimination based on "ancestry or ethnic characteristics." *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).

In the Ninth Circuit, courts apply the *McDonnell Douglas* burden-shifting analysis to section 1981 claims of racial discrimination. *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138,

1144-45 (9th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)). Under this analysis, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. "The proof required to establish a prima facie case is 'minimal and does not even need to rise to the level of a preponderance of the evidence." *Lindsey*, 447 F.3d at 1144 (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000)). "[I]f the plaintiff satisfies the initial burden of establishing a prima facie case of racial discrimination, the burden shifts to the defendant to prove it had a legitimate non-discriminatory reason for the adverse action." *Lindsey*, 447 F.3d at 1144. "If the defendant meets that burden, the plaintiff must prove that such a reason was merely a pretext for intentional discrimination." *Id*.

To establish a prima facie case for a section 1981 claim outside of the employment context, a plaintiff must show that he or she (1) "is a member of a protected class," (2) "attempted to contract for certain services," and (3) "was denied the right to contract for those services." *Id*. at 1145. In *Lindsey*, the Ninth Circuit applied a fourth element of the prima facie test: that "such services remained available to similarly-situated individuals who were not members of the plaintiff's protected class." However, it did not explicitly adopt this element for all section 1981 commercial services cases and discussed with approval the Sixth Circuit's alternative formulation of the fourth element as discussed below. *Id*. (discussing *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001)).

In *Christian*, two shoppers, a black woman (Christian) and a white woman, sued a retail store for race discrimination under federal and state law, including section 1981. 252 F.3d at 864. A store employee offered Christian repeated assistance, which she declined. The employee did not offer the white shopper any assistance. The employee then reported Christian to the store manager for shoplifting and a cashier called the police. Shortly before the police arrived, the employee discovered that "the item she believed had been stolen had been returned." *Id*. at 865-66. After the police arrived, they escorted the two shoppers out of the store even though no shoplifting had occurred. *Id*. at 866. Following a trial, the district court granted judgment as a matter of law to the defendant based on the plaintiffs' failure to prove its intent to discriminate. *Id*. at 867.

13

The Sixth Circuit reversed and remanded, concluding that the district court erred in omitting the traditional *McDonnell Douglas* burden-shifting framework in granting judgment as a matter of law. The court explained that although a plaintiff asserting a section 1981 claim must prove intentional discrimination, "it does not follow that the plaintiff must prove intentional discrimination as an element of the prima facie case," and that it was taking the "opportunity to fashion from a clean slate an appropriate prima facie test in the commercial establishment context." *Id*. at 869-70. The Sixth Circuit distinguished the commercial services context from the employment context, observing that "in the employment context it makes sense to insist upon evidence of 'similarly situated applicants or employees,'" because employment decisions are regularized, made by supervisory personnel, and "by their very nature are almost always documented." *Id*. at 870 (quoting *Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694, 706 (D. Md. 2000)). In contrast, the court noted that in the context of the denial of services by a commercial establishment, "the task of producing similarly situated persons outside the protected group is much more difficult," given the itinerant nature of the clientele. *Id*. at 870 (citing *Callwood*, 98 F. Supp. 2d at 706). The court held that "[b]y holding a plaintiff to the requirement that she produce similarly situated persons who were not discriminated against, we would be foreclosing other methods of proving intentional discrimination." *Id*. at 872. The Sixth Circuit modified the prima facie case to require that a plaintiff in a section 1981 commercial services case show that "(3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." *Id*.

While the Ninth Circuit has not adopted the Sixth Circuit's version of the test, the court in *Lindsey* described the reasoning in *Christian* as "compelling" and left open the possibility that it would adopt its alternative formulation in commercial non-employment section 1981 cases. *Lindsey*, 447 F.3d at 1145. This court concludes that the test from *Christian* is a better fit for the circumstances of this case, as evidenced by the parties' competing arguments regarding the

14

similarly situated test. According to Defendants, Makhzoomi must show that the services at issue, air travel, "remained available to similarly-situated individuals who were not" members of the Middle Eastern and Muslim communities. They assert that the appropriate group of similarly-situated individuals to which Makhzoomi must be compared is "passengers who were reported to have been overheard on the airplane making potentially threatening comments." Mot. 10. However, given that there is no evidence that any passenger other than Makhzoomi was deplaned and denied permission to reboard, Defendants' overly narrow comparison would completely foreclose Makhzoomi's discrimination claim. It also illustrates the drawbacks of the test that the Sixth Circuit identified in *Christian*, that the similarly situated test is "particularly onerous because of the difficulty in replicating a particular [plaintiff's] experience." *See Christian*, 252 F.3d at 872. For his part, Makhzoomi contends that the appropriate comparators are all of the other passengers on the airplane, but that comparison does not capture the specifics of this particular case and is so broad as to be meaningless. In contrast, the test from *Christian* allows for differences between commercial interaction and employment claims and more properly accounts for the factual context presented here.

Applying the test from *Christian*, it is undisputed that Makhzoomi can meet the first three prongs of a prima facie case. He is a member of a protected class, attempted to contract for Southwest's services by buying a ticket for the flight, and was denied the right to reboard the airplane after Ahmed questioned him. Therefore, Makhzoomi's ability to establish a prima facie case turns on whether he can demonstrate that he "was deprived of services while similarly situated persons outside the protected class were not and/or . . . received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." According to Makhzoomi, as soon as he and Ahmed reached the jet bridge, Ahmed asked him for some details about his phone call. After learning that Makhzoomi had been speaking with his uncle in Arabic, Ahmed did not explain why he was questioning Makhzoomi, and did not inform him of the substance of Patel's complaint, or ask him whether he had used any alarming words during his conversation. Instead, Ahmed chastised him for speaking in "that language" given "the environment" and accused Makhzoomi of causing a delay. After Makhzoomi blamed

Islamophobia for the situation, Ahmed replied, "You are not getting back into that plane."

Makzhoomi's account finds corroboration in the record. As discussed above, Hoyle testified that he heard Ahmed say to Makzhoomi, "[t]his is an inappropriate conversation to have on an airplane." Hoyle's testimony is ambiguous; Ahmed's statement about "an inappropriate conversation" could be a reference to Makzhoomi's purported references to a bomb, martyrdom, ISIS, and jihad, or it could be a reference to Makzhoomi's speaking in Arabic on the airplane. At this stage, drawing all inferences in Makzhoomi's favor, a reasonable jury could conclude that the statement Hoyle heard was a reference to Makzhoomi's having a conversation in Arabic on the airplane, which supports Makzhoomi's version of events.

Further, a reasonable jury could conclude that Ahmed subsequently influenced law enforcement to take action against Makzhoomi. According to Taylor, Ahmed told him that a passenger had overheard Makzhoomi "making statements on his cell phone that sounded like 'martyr' or suicide statements," after which law enforcement detained Makzhoomi for further investigation. In other words, a reasonable juror could rely on Taylor's testimony to conclude that law enforcement took action solely on the basis of Ahmed's report. Based on this evidence, and construing all disputed facts in Makzhoomi's favor, a reasonable jury could determine that Makzhoomi "received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory," because Ahmed made no real attempt to investigate Patel's complaint or determine whether Makzhoomi truly posed a safety risk to the flight, and instead unilaterally decided he was not getting back on the flight because he spoke Arabic on a flight in a sensitive political climate, and turned him over to law enforcement.

Accordingly, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for the adverse action. According to Defendants, Ahmed asked Makzhoomi to step off the airplane "because Dr. Patel reported he had made potentially threatening statements." Mot. 11. However, as noted above, Makzhoomi does not challenge Ahmed's decision to investigate Patel's claim by speaking to Makzhoomi. Instead, he asserts that Ahmed's refusal to allow him to re-board the flight after their conversation was discriminatory. Defendants did not expressly address a legitimate, non-discriminatory reason for that specific decision in their motion or at the hearing,

16

but the court presumes that Defendants would rely on Ahmed's disputed testimony that Makhzoomi admitted to Ahmed that he used the words bomb, martyrdom, ISIS, and jihad on the airplane, and that his admission justified further investigation by law enforcement.

"Once a defendant presents legitimate non-discriminatory reasons, the presumption of discrimination 'drops out of the picture,' and the plaintiff has the new burden of proving that the proffered reasons were a pretext for discrimination." *Lindsey*, 447 F.3d at 1148. "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Id*. (quotation omitted). "Although the inference of discrimination created from the prima facie case is gone, the evidence used in its establishment may be considered for examining pretext." *Id*. (citation omitted).

Makhzoomi states that he was "denied boarding, berated, and turned over to law enforcement" for speaking Arabic. Opp'n 19. He asserts that there a number of factual disputes regarding the reason he was denied permission to re-board the airplane after speaking with Ahmed. As an initial matter, he disputes Defendants' contention that he "implicate[d] any safety violations or concerns," denying that he ever made "potentially threatening statements" or used "the English words 'bomb', 'ISIS', and 'Jihad'." *Id*. at 18-19. Makhzoomi also highlights a number of inconsistencies in the record that he contends create disputes of material fact regarding Defendants' motivation for their actions. First and foremost, he notes the differences between his version of his conversation with Ahmed on the jet bridge and Ahmed's own version. According to Makhzoomi, Ahmed chastised him for speaking in Arabic and told him that it was an "inappropriate conversation to have on an airplane." *See* Hoyle Dep. 61. Ahmed then retaliated against Makhzoomi for saying "[t]his is what Islamophobia got this country into," telling Makhzoomi that he was "not getting back into that plane." *See* Makhzoomi Dep. 118, 130-31. Makhzoomi also asserts that Ahmed's testimony that Patel complained about hearing the words "bomb," "ISIS," or "jihad" is inconsistent with and uncorroborated by the other Southwest employees' testimony and written reports of the incident. Opp'n 22. Finally, Makzhoomi

17

disputes Defendants' claim that they were concerned about safety, noting Patel's testimony that she was not frightened but was instead "stressed out" about "[h]aving to communicate something about another passenger to the airline." *See* Patel Dep. 53. Given these factual disputes, and accepting his testimony as true, Makhzoomi argues that there is a material dispute of fact as to whether Ahmed's refusal to allow him back onboard the airplane after questioning him was discriminatory. *See* Opp'n 19-20.

The court concludes that Makhzoomi has presented genuine issues of fact regarding the proffered non-discriminatory reason for denying him his seat on the flight after questioning him. Defendants claim that once Ahmed and Makzhoomi reached the jet bridge, Ahmed informed Makhzoomi about "why he was brought onto that bridge" and explained that a passenger had reported a concern that he was speaking about martyrdom, ISIS, jihad, and a bomb. *See* Ahmed Dep. 103. According to Ahmed, Makzhoomi admitted using those words to Ahmed and apologized. Law enforcement officers standing behind the two men during their conversation overheard Makhzoomi's admission that he had used the words martyrdom, ISIS, jihad, and bomb on the airplane and "took over," detaining Makhzoomi for further investigation. Ahmed Dep. 67, 116, 122.

Makzhoomi disputes Ahmed's account. Makzhoomi denies that Ahmed told him about Patel's complaint and denies that Ahmed asked him about whether he had used any specific words during his conversation with his uncle. According to Makzhoomi, after explaining to Ahmed that he had been speaking in Arabic with his uncle, Ahmed chastised him, saying "Why do you speak in that language? Don't you know the environment around us?" and blamed Makzhoomi for causing the flight's delay. Makzhoomi Dep. 117-118. After Makzhoomi responded that Islamophobia was responsible, Ahmed abruptly informed Makzhoomi that he was "not getting back into that plane." *Id*. at 118, 130-31. Aside from Makzhoomi and Ahmed's accounts, the only other testimony in the record about what Ahmed said to Makzhoomi is by Hoyle, who heard Ahmed refer to "an inappropriate conversation to have on an airplane." Accepting Makzhoomi's version of events as true, and drawing all reasonable inferences in his favor, a reasonable jury could conclude that a reasonable, good faith investigation of Patel's complaint should have

included questions about the substance of Makhzoomi's conversation on the airplane and whether

he had used any of the words Patel reported overhearing to determine whether there had been a

misunderstanding. Such a jury could find that Ahmed instead made no real effort to determine

whether Patel's complaint had any merit and unilaterally decided to deny Makhzoomi his seat on

the flight for speaking Arabic.[4]

Moreover, the circumstances surrounding Makhzoomi's removal from the jet bridge by

law enforcement are also disputed and material to the outcome of his section 1981 claim. Ahmed

testified that he never reported his conversation with Makzhoomi to the officers because they were

standing right behind the two men and had already heard Makhzoomi's admission that he had used

the words bomb, martyrdom, ISIS, and jihad. According to Ahmed, law enforcement "essentially

took over" at that point. But both Makhzoomi and Taylor contradict this account. Makzhoomi

testified that after Ahmed stated, "You know what? You are not getting back into that plane,"

Ahmed spoke with a police officer who then contacted the FBI. Taylor's recollection is

consistent with Makhzoomi's. In his report, Taylor wrote that he "received a radio call regarding

a possible breach at Gate 10," and that once he arrived, he spoke with Ahmed. According to

Taylor, Ahmed reported that a witness "told him that while she was standing on the plane behind

[Makzhoomi] waiting to be seated, she overheard him on his cell phone making statements

referencing 'being a Martyr, America', which she interpreted as terrorist statements." Taylor

report. Taylor then called for his supervisor and backup, and the officers directed Makzhoomi to

accompany them to the gate area. Accepting Makhzoomi and Taylor's testimony as true, a

reasonable jury could conclude that Ahmed failed to perform a reasonable, good faith

investigation of Patel's complaint, and that law enforcement detained Makzhoomi for

investigation based solely on Ahmed's statements about what had happened. Notably, Taylor

responded to a radio call regarding a possible "breach" of security. There is no evidence that the

---

[4] Defendants make the bald statement that "even if Mr. Ahmed had asked why Makhzoomi was speaking in Arabic on the airplane, which he denies, the question would not prove racial bias. Mr. Ahmed is, himself, an Arabic speaker and a devout Muslim." Mot. 14. Defendants do not provide authority to support that discrimination in a section 1981 commercial services case cannot be found where the alleged discriminator is a member of the same protective class as the plaintiff. As Defendants failed to brief the issue, the court declines to address it.

call for assistance referenced terrorist statements or anything of that nature. Taylor Dep. 18-19; Taylor report. A reasonable jury could conclude that Taylor took action based solely on Ahmed's statements about Patel's complaint, that Ahmed's report to Taylor was motivated by discrimination towards Makhzoomi, and that there could have been a different outcome had Ahmed handled the situation differently.

Defendants urge the court to disregard Makhzoomi's version of the events on the jet bridge, although they do not address the discrepancy regarding how Taylor learned of Patel's report. They argue that Makhzoomi's testimony is inconsistent with the FBI report, in which the agents wrote, "Makhzoomi stated [redacted] questioned him about his telephone conversation with his uncle. [Redacted] asked him if he had spoken about ISIL, martyrdom, or suicide in America. Makhzoomi told [redacted] he does not believe in jihad, martyrdom, or suicide." FBI report. Defendants note the Supreme Court's instruction that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on a motion for summary judgment. Mot. 14 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). They contend that Makhzoomi's assertion that Ahmed asked him only why he was speaking in Arabic is "blatantly contradicted by the FBI agents who interrogated him." Mot. 14-15. Defendants essentially ask the court to weigh Ahmed's testimony and the FBI report against Makhzoomi's statements, which the court may not do. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions[.]").

In sum, the court concludes that Makhzoomi has presented evidence sufficient to create a triable issue of fact that Defendants' non-discriminatory reason for denying him his seat on the flight after questioning him was pretextual, and that Ahmed denied him reboarding and turned him over to law enforcement because he was speaking Arabic on the airplane.[5] *See Lindsey*, 447 F.3d at 1148 ("Once a prima facie case is established . . . summary judgment for the defendant will

---

[5] As the court concludes that Makhzoomi has established a triable dispute of fact regarding whether he was denied reboarding based on the fact that he was speaking Arabic, it need not reach his other arguments about which specific words Patel reported overhearing and whether Patel was frightened about what she had overheard.

ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the 'elusive factual question of intentional discrimination.'" (quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985), *amended by* 784 F.2d 1407 (1986))). Summary judgment on Makhzoomi's section 1981 claim is therefore denied.

### B. State Law Claims

Makhzoomi's remaining state law claims are claims for violation of the Unruh Act, negligence, and intentional infliction of emotional distress. Defendants move for summary judgment on these three claims on the ground that they are preempted by the Federal Aviation Act ("FAA"), 49 U.S.C. § 40103 *et seq.* and the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b). They also argue that they are entitled to summary judgment on the negligence and intentional infliction of emotional distress claims.

#### 1. FAA Preemption

The FAA provides that air carriers "may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." 49 U.S.C. § 44902(b). Defendants argue that Makhzoomi's state law claims are preempted by section 44902(b) because they refused to transport Makhzoomi due to safety concerns.

In *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470-73 (9th Cir. 2007), the Ninth Circuit examined the purpose, history, and language of the FAA and concluded that "Congress intended to have a single, uniform system for regulating aviation safety." The court held that the FAA and the relevant federal regulations promulgated by the Federal Aviation Administration preempted state law claims based on airlines' failure to warn air passengers of the danger of developing deep vein thrombosis "because the FAA preempts the entire field of aviation safety through implied field preemption." *Id*. at 468, 472-73. Two years later, the Ninth Circuit "circumscribed the preemptive effect of the FAA" in *Martin ex rel. Heckman v. Midwest Express Holdings, Inc.*, 555 F. 3d 806, 811 (9th Cir. 2009). *Ventress v. Japan Airlines*, 747 F.3d 716, 721 (9th Cir. 2014) (discussing Ninth Circuit authority on FAA preemption). In *Martin*, the court clarified that *Montalvo* "means that when the agency issues 'pervasive regulations' in an area, like [the] passenger warnings [at issue in *Montalvo*], the FAA preempts all state law claims in *that* area."

555 F.3d at 811 (emphasis in original); *see Ventress*, 747 F.3d at 721 (discussing *Martin*). However, "[i]n areas without pervasive regulations or other grounds for preemption, the state standard of care remains applicable." *Martin*, 555 F.3d at 811. The court held that state tort claims involving airplane stairs were not preempted by federal law because there were no federal aviation regulations governing that aspect of airplane design. *Id*. at 812.

Finally, in *Ventress*, the Ninth Circuit considered whether the FAA preempted an airline pilot's state law retaliation and constructive termination claims based on his reporting of safety concerns about a fellow pilot. 747 F.3d at 719. Noting that it was "[m]indful that the FAA does not preempt all state law tort actions touching air travel," the court found that the claims were "little more than backdoor challenges to [the airline's] safety-related decisions regarding . . . [the] physical and mental fitness to operate civil aircraft" of the plaintiff and the pilot about whom he complained. The claims were thus preempted. *Id*. at 719, 722 (citing *Martin*, 555 F.3d at 809). The court noted that the plaintiff's claims would require the factfinder to examine the pilots' medical fitness and the reasons for the plaintiff's termination, and concluded that "[t]his inquiry . . . intrudes upon the federally occupied field of pilot safety and qualifications that Congress has reserved for the [Federal Aviation Administration]" and "interferes with the agency's authority to serve as the principal arbiter of aviation safety." *Ventress*, 747 F.3d at 722. The court held that "federal law preempts state law claims that encroach upon, supplement, or alter the federally occupied field of aviation safety and present an obstacle to the accomplishment of Congress's legislative goal to create a single, uniform system of regulating that field." 747 F.3d at 722-23.

Neither *Montalvo*, *Martin* nor *Ventress* addressed whether section 44902(b) preempts state law claims based upon an airline's refusal to transport a passenger who may be "inimical to safety." However, in *Shaffy v. United Airlines, Inc*., 360 Fed. Appx. 729, 730-31 (9th Cir. 2009), the Ninth Circuit affirmed summary judgment of state law claims on the ground that section 44902(b) preempted the claims. The plaintiff in *Shaffy* brought state law race discrimination and tort claims challenging her removal from a flight after the flight captain determined that she and her dog posed possible risks to safety, and the court found that the plaintiff's state law claims were preempted since they "directly implicate[d] the decision by [the airline] to remove her from the

United States District Court
Northern District of California

flight for safety reasons." *Id*. at 731. The court held that "[t]he test for whether a refusal to transport is permissible 'rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinions and made its decision and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary.'" *Id*. at 730 (quoting *Cordero v. Cia Mexicana De Aviacion, S.A.*, 681 F.2d 669, 672 (9th Cir. 1982)). "The refusal to transport is 'not to be tested by other facts later disclosed by hindsight.'" *Id*. (quoting *Cordero*, 681 F.2d at 672).

Defendants previously moved for judgment on the pleadings and to dismiss Makhzoomi's state law claims based on section 44902(b) preemption, arguing that the allegations in the complaint indicated that "safety played a role in Makhzoomi's removal from the plane" because he "was the subject of a complaint." *Makhzoomi*, No. 18-cv-00924-DMR, 2018 WL 3861771, at *4. The court denied the motions as premature, holding that it was "difficult to resolve the preemption issue without discovery and a clear understanding of what the facts actually are." *Id*. at *5 (quoting *Chowdhury v. Northwest Airlines Corp*., 238 F. Supp. 2d 1153, 1157 (N.D. Cal. 2002)). Defendants now argue that Makhzoomi's state law claims should be held preempted "[b]ecause discovery indisputably demonstrates that Mr. Makhzoomi's claims implicate safety." Mot. 19. As discussed above, Makhzoomi does not challenge his removal from the airplane for questioning following Patel's credible safety-related complaint. Instead, Makhzoomi's claim focuses on Ahmed's actions in investigating Patel's complaint, and his belief that Ahmed refusal to let him reboard amounted to punishment for speaking Arabic on the plane. There are disputes of material fact regarding whether Ahmed's refusal to allow Makhzoomi to reboard the flight for safety reasons was pretext for discrimination. Given these disputes, a reasonable jury could conclude that Makzhoomi's treatment was discriminatory and thus "arbitrary" within the meaning of section 44902(b). Summary judgment based on FAA preemption is accordingly denied.

### 2. ADA Preemption

In relevant part, the ADA provides that

> [A] State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route,

or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1). In *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265 (9th Cir. 1998) (en banc), the Ninth Circuit held that Congress's "clear and manifest purpose" in enacting the ADA was to achieve "the economic deregulation of the airline industry" and "promote 'maximum reliance on competitive market forces.'" (quoting *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 230 (1995)). It found that

> when Congress enacted *federal* economic deregulation of the airlines, it intended to insulate the industry from possible *state* economic regulation as well. It intended to encourage the forces of competition. It did not intend to immunize the airlines from liability for personal injuries caused by their tortious conduct. Like "rates" and "routes," Congress used "service" in § 1305(a)(1)[6] in the public utility sense— i.e., the provision of air transportation to and from various markets at various times.

*Charas*, 160 F.3d at 1266 (emphases in original). Accordingly, it held that the term "service" within the meaning of the ADA "refer[s] to the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail," and does not include "an airline's provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." *Id*. at 1261. In *Newman v. American Airlines, Inc*., 176 F.3d 1128, 1131 (9th Cir. 1999), the Ninth Circuit held that the definition of the term "service" from *Charas* is "equally applicable" to discrimination claims, concluding that "[a]s used in a public utility sense, the term 'service' does not refer to alleged discrimination to passengers due to their disabilities." The Ninth Circuit recently reaffirmed *Charas*'s analysis of the term "service," while recognizing that it has taken a narrower view of the term than have other circuit courts. *Nat'l Fed'n of the Blind v. United Airlines Inc*., 813 F.3d 718, 726-28 (9th Cir. 2016).

Here, Defendants argue that Makhzoomi's state law claims relate directly Southwest's provision of "services" because they are based on his denial of access to Flight 4260. Specifically,

---

[6] 49 U.S.C. § 41713(b)(1) was originally located at 49 U.S.C.App. § 1305(a)(1), which preempted state laws "relating to the rates, routes, or service of any air carrier." *Nat'l Fed'n of the Blind v. United Airlines Inc*., 813 F.3d 718, 726 n.7 (9th Cir. 2016). Section 1305(a)(1) was amended and incorporated into the Federal Aviation Administration Authorization Act of 1994, adding "price" as one of the enumerated categories of preempted state laws. *Id*. "Congress intended this amendment 'to make no substantive change.'" *Id*. (quotation omitted).

his Unruh Act claim is based on his allegations that Defendants "wrongfully removed Plaintiff from the airplane for . . . talking on the phone in Arabic" and "den[ied] him of his contractual rights" based on discrimination. Compl. ¶¶ 76, 80. His negligence and intentional infliction of emotional distress claim are based on the same or similar allegations. *See id*. at ¶¶ 90-91, 97-98. Accordingly, they argue, the claims are preempted by the ADA. The court disagrees. In *Chowdhury v. Northwest Airlines Corp*., 238 F. Supp. 2d 1153, 1155-56 (N.D. Cal. 2002), a court in this district relied on *Charas* and *Newman* to conclude that a plaintiff's state law race discrimination claims were not preempted by the ADA:

> If refusing to allow a passenger to board because of her disability is not a 'service' within the meaning of the ADA, then refusing to allow a passenger to board because of his race is also not a 'service.' In both cases the challenged conduct—refusing to allow a particular passenger to board—has nothing to do with the provision of transportation to and from various markets.

The court agrees with the reasoning in *Chowdhury* and finds it persuasive. Under Ninth Circuit authority, "the term 'service'" as used in the ADA "refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided." *Charas*, 160 F.3d at 1265-66. It does not include refusing to allow a passenger to board based on his race, as Makhzoomi alleges. *See Newman*, 176 F.3d at 1131. Defendants' motion for summary judgment on Makhzoomi's state law claims based on ADA preemption is denied.

### 3. Immunity

Defendants next move for partial summary judgment on Makhzoomi's claims for damages associated with the actions or involvement of the LAWA officers, the FBI, or the TSA, asserting immunity under the Aviation Transportation Security Act ("ATSA"), 49 U.S.C. § 44941, and California Civil Code section 47. According to Defendants, they are entitled to immunity for Makhzoomi's claims to the extent that they are based on Makhzoomi's detention by law enforcement, search, pat-down, and interrogation. Mot. 26.

Congress created the Transportation Security Administration ("TSA") in 2001 "to assess and manage threats against air travel." *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 241

(2014) (citing ATSA, 49 U.S.C. § 44901 *et seq.*). "The ATSA shifted from airlines to the TSA the responsibility for assessing and investigating possible threats to airline security." *Id*. at 248 (quotation omitted). "To ensure that the TSA would be informed of potential threats, Congress gave airlines and their employees immunity against civil liability for reporting suspicious behavior." *Id*. In relevant part, ATSA provides that that

> [a]ny air carrier or foreign air carrier or any employee of an air carrier or foreign air carrier who makes a voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or terrorism, as defined by section 3077 of title 18, United States Code, to any . . . Federal, State, or local law enforcement officer, or any airport or airline security officer shall not be civilly liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, for such disclosure.

49 U.S.C. § 44941(a). However, the immunity "does not attach to 'any disclosure made with actual knowledge that the disclosure was false, inaccurate, or misleading' or 'any disclosure made with reckless disregard as to the truth or falsity of that disclosure.'" *Air Wisconsin*, 571 U.S. at 241 (quoting 49 U.S.C. § 44941(b)). The Supreme Court has explained that this exception is patterned after the actual malice standard from *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). *Air Wisconsin*, 571 U.S. at 246.

In support of Defendants' claim that they are entitled to immunity for any damages related to their reports about Makhzoomi to law enforcement, Defendants rely on *Baez v. JetBlue Airways Corp.*, 793 F.3d 269 (2d Cir. 2015). In *Baez*, the plaintiff timely checked her luggage in for a flight but appeared at the gate for the flight only minutes before its scheduled departure. *Id*. at 272. The gate agent informed her that the airplane's door was closed and that she could not board the flight, to which the plaintiff replied, "Isn't it a security risk to let a bag go on a plane without a passenger, what if there was a bomb in the bag?" She also disparaged the effectiveness of the TSA. *Id*. The gate agent alerted her supervisor, and the airline contacted security personnel, the TSA, and the FBI. *Id*. at 272-73. Security personnel detained and questioned the plaintiff, and she was then questioned at length by law enforcement agents. As a security measure, the airline and law enforcement decided to reroute the airplane carrying the plaintiff's luggage. After

landing, security officers searched the plaintiff's luggage and found no bomb. The plaintiff was ultimately charged with making a false bomb threat. *Id*. at 273. She later brought various state law claims against the airline and the gate agent, including false arrest and intentional infliction of emotional distress. The district court granted summary judgment to the defendants based on ATSA immunity. *Id*.

The Second Circuit affirmed. It noted that there were differences between the statements that the plaintiff conceded she made and the statements she alleged the gate agent reported to law enforcement officials. However, it concluded that the differences were "immaterial" for purposes of ATSA immunity, noting that "since [the plaintiff's] luggage was indisputably a checked bag unaccompanied by its owner, a reasonable [law enforcement] officer . . . would have wanted to investigate." *Id*. at 275 (quotation omitted). The court agreed with the district court's observation that "a passenger who speculates aloud about whether there is a bomb in her luggage cannot be heard to complain when an airline representative reports the use of those words, even if the passenger's precise words are misrepresented." *Id*. at 276. The court concluded that the defendants were entitled to ATSA immunity, holding that given the undisputed fact that the gate agent and airline "were aware of ominous (even if ambiguous) references to a bomb on a flight, no reasonable jury could find that differences in wording" in the accounts "constituted materially false statements made to law enforcement." *Id*. at 276.

Here, Defendants assert that "Southwest called for law enforcement based on a passenger's report that she overheard the plaintiff discussing suicide martyrdom," and that testimony by numerous witnesses supports the fact "[t]hat such a report was made." Mot. 26. Defendants do not identify the statements to law enforcement at issue with any particularity. In response, Makhzoomi disputes the application of ATSA immunity here, arguing that the disclosures to law enforcement were false, or at a minimum, made with reckless disregard to the truth of the statements and therefore fall within the exception to ATSA immunity. Opp'n 27.

The problem with these arguments is that the current record contains disputed facts regarding what the law enforcement officers were told and by whom. Therefore, the court is unable to resolve the ATSA immunity question at this time. As discussed above, Taylor

responded to a radio call regarding a possible breach of security. There is no evidence that the call for assistance referenced statements about suicide martyrdom or anything related to terrorism. Taylor Dep. 18-19; Taylor report. Once Taylor arrived at the gate, Ahmed reported that a witness "told him that while she was standing on the plane behind [Makzhoomi] waiting to be seated, she overheard him on his cell phone making statements referencing 'being a Martyr, America', which she interpreted as terrorist statements." Taylor report. This report prompted Taylor to call for backup, leading to Makhzoomi's detention. A reasonable jury could conclude that Ahmed did not make a reasonable, good faith investigation of Patel's complaint, and thus his report to Taylor was either false or made with reckless disregard as to its truth. Taylor's account is disputed, as Ahmed expressly denies having reported anything to law enforcement. Given these disputes of fact, the court cannot determine whether any report by Southwest or its employees falls within the ATSA immunity provision, as Defendants argue, or its exception, as Makhzoomi asserts. Summary judgment based on ATSA immunity is therefore denied without prejudice to Defendants raising it at a later stage in the proceedings.

For the same reasons, summary judgment based on California Civil Code section 47 immunity is also denied. Section 47 provides that certain publications or broadcasts are privileged. Defendants do not cite a particular provision of section 47 but appear to rely on section 47(b), which "bars a civil action for damages for communications made '[i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to [statutes governing writs of mandate],'" with certain statutory exceptions that do not apply in this case. *Hagberg v. California Federal Bank*, 32 Cal. 4th 350, 360 (2004) (brackets in original). Courts have interpreted section 47(b) as providing an absolute privilege to reports made to law enforcement to report suspected criminal activity, such that the reports "cannot be the basis for tort liability." *See, e.g., Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1258 (9th Cir. 2008) (holding that phone call to San Francisco police by airline employee was "privileged under state law and thus cannot be the basis for tort liability," citing *Hagberg*, 32 Cal. 4th at 364); *Hagberg*, 32 Cal. 4th at 364 (finding persuasive cases holding "that when a citizen contacts law

enforcement personnel to report suspected criminal activity and to instigate law enforcement personnel to respond, the communication . . . enjoys an unqualified privilege under section 47(b).").

Given the disputes of fact about what was reported to law enforcement and by whom, the court denies summary judgment on Makhzoomi's state law claims based on section 47 immunity without prejudice to Defendants renewing the motion at a later stage.

### 4. Negligence Claim

Defendants next move for summary judgment on Makhzoomi's negligence claim. They argue that Makhzoomi cannot maintain such a claim in the absence of a duty owed by Defendants.

"Under California law, '[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages).'" *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009) (quoting *McGarry v. Sax,* 158 Cal. App. 4th 983, 994 (2008)). The existence of a duty of care is a question of law. *Ballard v. Uribe*, 41 Cal. 3d 564, 572 n.6 (1986).

California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others. Cal. Civ. Code § 1714(a); *Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 768 (2011) (citing Cal. Civ. Code § 1714(a)); *T.H. v. Novartis Pharm. Corp.*, 4 Cal. 5th 145, 163 (2017) (same). "[I]n the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create [a duty] only where [it is] clearly supported by public policy." *Cabral*, 51 Cal. 4th at 771; *see also Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 397 (1992) (courts use the "concept of duty to limit generally the otherwise potentially infinite liability which would follow from every negligent act"); *Burns v. Neiman Marcus Group, Inc.*, 173 Cal. App. 4th 479, 487 (2009) ("California courts have explicitly rejected the concept of universal duty.").

To determine whether a duty exists, courts consider the following factors, known as the "*Rowland* factors":

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968). When applying the *Rowland* factors, the question is not whether the specific facts support an exception to the general duty of reasonable care, but "whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy." *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017) (quoting *Cabral*, 51 Cal. 4th at 772). Unlike the other elements of negligence—breach, injury, and causation—which are necessarily fact-dependent, the "[a]nalysis of duty occurs at a higher level of generality." *Vasilenko*, 3 Cal. 5th at 1083 (citing *Cabral*, 51 Cal. 4th at 774).

Here, Makhzoomi asserts that his negligence claim is based on "his contractual relationship with Southwest, and their duty to not harass, humiliate, embarrass, and deplane him, denying him the rights and services for which he contracted." Opp'n 29. However, he does not identify a legal duty owed by Defendants to him, and does not address any of the *Rowland* factors to argue that the court should find that legal duty existed in this case. Accordingly, given Makhzoomi's failure to establish a duty owed by to him by Defendants, summary judgment on Makhzoomi's negligence claim is granted.

### 5. Intentional Infliction of Emotional Distress

Finally, Defendants move for summary judgment on Makhzoomi's claim for intentional infliction of emotional distress.

In order to establish a claim for intentional infliction of emotional distress, Makhzoomi must show "(1) extreme and outrageous conduct by [Defendants] with the intention of causing, or reckless disregard of the probability of causing, emotional distress"; (2) that he "suffer[ed] severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by [Defendants'] outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (citations and quotation marks omitted). "A defendant's conduct is 'outrageous' when it is so 'extreme as to

exceed all bounds of that usually tolerated in a civilized community." *Id*. at 1051 (citations and quotation marks omitted). "Insults, indignities, annoyances, and petty oppressions may be insufficient." *Miller v. United Parcel Serv., Inc*., No. C 03-2405 PJH, 2004 WL 1771571, at *14 (N.D. Cal. Aug. 6, 2004) (citing *Agarwal v. Johnson*, 25 Cal. 3d 932, 946 (1979)).

Defendants argue that they are entitled to summary judgment on this claim because Makhzoomi cannot show that their actions were "extreme and outrageous" or that he suffered severe or extreme emotional distress as a result of such actions.

In his opposition, Makhzoomi cites his testimony that he was removed from the flight "in front of other passengers, aggressively patted down throughout his body and 'private parts', and that he suffered from an emotional breakdown at the airport," arguing that this evidence shows "outrageous conduct" by Defendants. Opp'n 30. He spends the remainder of his opposition to this portion of Defendants' motion discussing the evidence of his resulting emotional distress. *See id*. at 30-31. Accepting Makzhoomi's version as true, the court concludes that he has failed to establish the requisite outrageous conduct for this claim. As noted, Makhzoomi does not challenge Patel's credibility or Defendants' decision to investigate her complaint, including asking him to deplane for questioning. Therefore, his emotional distress claim must be based upon Defendants' refusal to allow him to reboard the flight and his subsequent detention for investigation by law enforcement. Makzhoomi's experience on the jet bridge and detention by law enforcement may have been discriminatory, distressing and embarrassing. However, this is not a case involving the use of racial slurs or other behavior that is "regarded as atrocious, and utterly intolerable in a civilized community." *See* Restatement (Second) of Torts § 46 (1965). Makhzoomi offers no argument or authority to support that discriminatory conduct of any kind can constitute extreme and outrageous conduct. *See, e.g., Mayfield v. Sara Lee Corp*., No. C 04-1588 CW, 2005 WL 88965, at *10 (N.D. Cal. Jan. 13, 2005) (holding in employment discrimination case that supervisors' behavior, while "offensive," was not "so outrageous as to exceed the bounds of behavior usually tolerated," where plaintiffs alleged that one supervisor "yells and uses obscenities against [plaintiffs]" and another directed a plaintiff "not to give [the supervisor's] business cards to Mexican day laborers."). Accordingly, the court concludes that

31

Makhzoomi has failed to show that Defendants' actions were so outrageous as to exceed the bounds of behavior usually tolerated. Therefore, summary judgment is granted on this claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part, as follows: summary judgment is granted on Makhzoomi's negligence and intentional infliction of emotional distress claims. Summary judgment is denied on his section 1981 and Unruh Act claims.

**IT IS SO ORDERED.**

Dated: December 19, 2019



Donna M. Ryu
United States Magistrate Judge